Thank you. May it please the Court, Gailen Cummins on behalf of Jason Robinson and I would like to reserve five minutes for rebuttal. Okay. So as this Court is aware, it was more than three years ago that Jason Robertson first began his study about arrests and racial profiling in California and reviewed the misdemeanor arrest citations that are filed as criminal complaints in the Superior Courts in Riverside and other California counties. But for the last three years, he has had no access to these court records at various courts in California because the Superior Court will not make available to him in what they call bulk enough records for a statistical sampling for his study, and perhaps even more egregiously — Roberts, let me just stop you right there. How do we know that they wouldn't have made sufficient records available such that they would be — you know, like, I was thinking, we'll give you — we can't give you all 10,000 citations issued for this particular month or this particular period, but we'll come up with some — if you tell us how to come up with a statistically relevant sample, we'll provide that. You just said that they weren't going to provide that. How do we know that? When Mr. Robertson did the study in Riverside, in this litigation, the Court called into question whether that was even true, whether he had reviewed the Riverside records or not. And in response, he filed a declaration, and he put forward hard evidence how he had negotiated with the Court, how he had agreed to show up on only Tuesdays and Thursdays, you know, so that he wouldn't overburden the Court, and how he reviewed the records a box at a time — a box is 10,000 or some, you know, extremely large number of records — and that he reviewed them in the lobby. I'm sorry. Could you just tilt the microphone down just a little bit? I just want to see if that's a little better. I'm having a hard time hearing you. I apologize. And that he reviewed the records in the lobby batch by batch before returning them to the Court, and that, based on that process, it took the Court less than five minutes a day to hand him a batch and take another batch back. And that evidence is undisputed. He then — okay? He then had the series in Santa Barbara where, for weeks, he litigated and the settlement negotiations that he recorded were actually in the Santa Barbara case, our San Bernardino case. But let me stop, because what you're saying is not — I don't see it as responsive at all to the question I asked, which is, what would the Court in this case, not these other cases. I'm talking about the Court in this case. All I'm saying is that he's never gotten an answer since the superior court. That's my point. Can you hang on for one second? Okay? All I'm trying to figure out is you came — you just said about five minutes ago that the Court was not going to provide a sufficient sample for your client to do the research that he wants. And all I asked was, how do we know that? Because, basically, your client never waited for the response from the Court. So how — why are you able to say — or that's what I'm trying to figure out. How do we know that, in fact, the Court was not going to provide him with access that would have been sufficient for him to complete his study? Okay. Well, in this case, after the San Bernardino experience where he was denied access, on August 29, 2012, he received a phone call from Mimi Leister at the Court, and she specifically said to him, in essence, with respect to your July 21 request to start reviewing the records on September 9, don't bother to show up because the records are not going to be available to you. Unequivocal, not going to be available to you. On that — on that date, we can't — basically, I can't remember the volume of records, but it's a large volume, right? So what I understood her to say to your client was, on that date, we are not going to have 50,000 pieces of paper here for you to look at, right? That's right. But again, following a pattern in practice in San Bernardino. So then, on October 5th, the Court's executive officer basically wrote back and again said, in no uncertain terms, that your request for bulk access is denied. Right. You can only have them on the same, basically, terms that other members of the public get And by the way, that means you can get access to the first seven of these records if you know the name of the arrestee or the case number or the traffic citation number, but not otherwise, which is, again, most members of the public who want to review these records will not. And by the way, there's a limit of 25 records a day, and for more than seven records, you will have to pay a $15 search fee, which is, again, a prohibitive access restriction on access for anyone who wants to review these records for research, for statistical sampling, or anyone who wants to review more than seven of these records. So in essence, there was an unequivocal denial on August 29th, an additional unequivocal denial on October 5th, and then questions about reconsideration. What have you said on this topic in the past? What is your research really about? What is the design of your research? Which we would submit are unlawful content-based restrictions that have no support in the law and, in fact, a substantial body of law against it. I would hope that his response would have been, my purpose is to embarrass the court if the facts support its embarrassment. Right? Right. He wants to find out if there's a racial disparity in the way these public records are reviewed and how these public record proceedings are handled. Correct? I think two things. On the arrest function itself, because, again, these are law enforcement that are issuing the records in the first instance, and then they're filed on the court for enforcement purposes. So there's really two different branches of government that are at issue here. And the topic of arrests and racial profiling is and has long been a topic of incredible societal interest. So we stand here today after three years. We still have no final answer to whether he will ever get access to the records. But we have a series of denials and basically no real access to the records because we can't get access. We can't get an answer out of the court. And the district court has made it clear that we can't sue unless and until we get the court's final answer. So absent intervention by this court, Mr. Robertson is at a loss to know what more he can do. We believe his claims are ripe today. With respect to the hardship, I think that's pretty clear. You've got constitutional rights on one side, access to public judicial records, the right to speak on whatever the records show, whether arrests are lawful and fair and following a due process in California, whether the enforcement of those is, you know, subject to the same requirements. And I would submit to Your Honors that the record does not need any more development because the arrest citation is before the court. The contents that the judicial counsel want on it are undisputed. The fact that they're filed as court records is undisputed. The court's balancing of whether there's any privacy interest or not is routinely done as a legal matter by courts. There's just simply no other Can I ask you just to go back to something you were talking about a second ago? So in this October 5th letter that you're referencing, you're saying that the statement at the very end there where the court executive says, the best the court would be able to offer you would be an opportunity to inspect the requested citations on the same terms and conditions as are offered to all other court users. I think you read into that a whole bunch of limitations. I'm just wondering, where did that come from? I think it says, if we allow you access. No, it just says the best. Okay. It doesn't say we haven't made a decision one way or the other, but the best. Even if you're lucky enough that we're going to grant you any access, it says the best we could do is this. And then you said, well, what that means is the following ten restrictions that are completely, you know, would make it impossible, basically, for your client to conduct the study. Is that? I think the Court's precedent is very clear that any delay in access to court records constitutes a denial. It's irreparable harm. And again, Jason Robertson has filed a declaration saying he doesn't know of anything more he can do to ever get access to these records. He's shown up at various courts in California, Contra Costa, San Bernardino. In addition, I mean, at the very least, doesn't it show that the issue is now ripe? If the best they're doing is X and you can show that X is tantamount to a denial, fine. If X turns out not to be tantamount to a denial, that's a different story. But either way, ripeness has been shown by the very sentence just quoted, yes? Basically, Jason Robertson has no ability to compel the Court to give him the final answer, none. We stand here three years from the date. We still don't have a final answer. And again, he doesn't have any ability to get the records on his own and no ability to sue because the district court basically says that if and when or less than until he gets the final answer, then his claims aren't ripe and he has no standing. Can you or before I interrupted you, you were telling us about other courts that your client, I guess, has negotiated with to get access to similar records. Is that right? Yes, Your Honor. So just can you say a little bit more about how come things have worked so much more smoothly with respect to those courts and not so smoothly with respect to this Court? Up until sometime in 2012, Mr. Robertson would show up at the courts and work with the court staff to get access to these batched records so that he could go through them and review the violations that he wanted to review and do a statistical study. At some point in time, he showed up in San Bernardino and in Contra Costa and other courts in California, and there was a concentrated campaign to not give him access to those records. In Contra Costa, he tried to set it up in advance. I'll give you ten and a half weeks. I'd like to review the records. I'd like to show up on September 4th. And what does he get? After repeated contacts to the court in August, finally a phone call back on the 29th. Unequivocally, the records are not going to be available to you. What did the county, was it Riverside County that allowed your client access? Yes, Your Honor. And that was worked out in some fashion? Yes. What happened was that Mr. Robertson contacted the court. He exchanged emails as the evidence is in the record and basically tried to accommodate their scheduling and make it convenient for them. They agreed that it'd be best if he reviewed records on Tuesday and Thursday, which he agreed to do. And they agreed to basically give him one batch of 25 records at a time. He agreed not to take them out of order or in any way, you know, deface them. And then he would return the batch to the clerk and get another batch of the records to review. And that was very successfully done. It was a very peaceful process. And again, it's undisputed in the record, that took about five minutes of the court's time. Five minutes. Okay. And you're saying that that level of access would have been satisfactory to your client in this case? Yes, Your Honor. And you're saying that the October 5th letter, you read as a definitive denial even of that level of access? I do read it that way. And I also, again, this didn't happen in a vacuum. Mr. Robertson had sued in San Bernardino, had asked for access to the records, had shown up and they were never granted. The same thing was happening in Costa County. And there were other cases in California that it was happening in as well. So once again, there had been some change and the superior courts were no longer going to allow him this bulk access to review these records. Not based on any evidence that they have of any burden or hardship or cost or anything else. I don't, I didn't understand you to say that, was it Riverside where your client got the 25? That doesn't sound to me like bulk access. Bulk access is what your client initially wanted here, which is basically, I want you to basically back up the truck and let me have that, you know. No, my client asked to review specifically one month's worth of records from August of 2012, starting on September 4th. Which is like 10,000 citations, right? Which is one month's worth of records, one box. But isn't that 10? Well, but batch by batch. I mean, he was happy to do it batch by batch. We're just talking about 25 records at a time. I understood your client to say, basically, give me 10,000 records right now in a room so I can go through them all. And the Court said, well, no, we're not actually in a position to do that. Sorry. I don't think my client said that. And again, this certainly wasn't the practice anywhere else. And in fact, I think his letter, his two-page, single-spaced letter explaining his study and his purpose also explained how he had done it in other courts. So, again, I basically do not believe my client ever asked for that kind of bulk access. And in fact, there's never been an offer from the Superior Court today to make those records available 25 at a time, batch by batch. We're told they're off-site, they're someplace else, they're, you know. And by the way, if we ever give you access, you know, you have to agree to certainly, you know, tell us what your study's about, how it's designed, what you've said about it in the past. Again, things that Mr. Robertson believes are unconstitutional viewpoint restraints. Why don't you stop? We'll make sure that you have a couple of minutes for rebuttal. And let's hear from the court's lawyer. I'll blow you out of here if I do that. May it please the court. Is that good? Is the volume all right? May it please the court. My name is Robert Nave on behalf of the defendant. And before I get into our argument, you need to know, and I've said this before because I've had other arguments here, that you have one of the best court clerks I have ever had the pleasure of working with. Really, Ollie is just incredibly diligent. And you folks just need to know that because she's been great. And the second, welcome to the warmest day in San Francisco history, I guess, today. OK, so just go straight, since you chewed up a minute and a half with those pleasantries, why don't you just go straight to the October 5th letter? And boy, it sort of does seem plain there that the court is saying you're the best you could possibly hope for. And we're not even promising that. But the best you could hope for is access on the same terms and conditions offered to all other court users. And your opponent has said what that means is the following five things, which would basically preclude her client from being able to conduct any meaningful study. So what's your response to that? The response is that the letter is interim and that the court has been very clear to say that it is under review. And the problem with filing the lawsuit when it was filed was that the facts were still evolving. And you wait a minute, I'm having real trouble with the truth. First of all, it's correct, is it not, that now today, three years later, the decision has still not been reached, correct? Outside the record, Your Honor, and I can't answer the question without getting to the court made offers to the to Mr. No, no, that's not my question. The the the has a has the court made a decision that would be presumably a matter of public record. Yes, it has not because it has not received the information yet, but it's all extra records. So with respect to the sentence that the best you're saying, we're not we can't we can't take that as literal, that that is not a binding assertion by the court that no matter what, the best you're going to get is X. Because the court, I don't think so, to answer your question. Then what is the word the best mean in the English language? It means best, but, Your Honor, it's the context that matters. The paragraph before says this is still under review, and we need to understand you understand what the issue is. Right, but what was under review is whether you're going to get any access at all. And then the statement is made, it's the very last sentence of the letter, right? And it's just basically like even if what we were talking about before, even if we grant you some access, the best you could possibly hope for is the following. And I guess I'm still waiting to hear what's your response to her claim that what was communicated there were the following five limitations that would make any meaningful study of those records impossible. The answer is, Your Honor, that the court was first off making sure that Mr. Robertson understood that access would not be denied, right, because the court is saying we understand that we have an obligation to produce records. Would you mind if I sort of cut to the chase here? Sure. Some aspect of these records are public records. Yes. The public is entitled to know them, whether it shows that the court you represent is doing a wonderful job or something less than that, correct? On the other hand, you have seemed to have some legitimate concerns about the security of documents, information in these documents that might be personal or might be abused by people outside this particular realm. Have either of you considered sitting down with a mediator and having these things resolved out so you can come to a conclusion about access and what kind of access? Or do you really want the federal court to be telling your client how to run its business? Your Honor, we have always been willing to settle this case. We have always been willing to talk. Difference between settlement and . . . I would . . . and no, would . . . would . . . You're open to mediation? Oh, absolutely. Sure. Would you mind if I ask her? Of course. Yeah. What's your position on mediation? Your Honor, I wouldn't get over to the Department of Safety . . . I really want to hear you say yes. The problem is, this realm, we want access to . . . We've never had an offer, ever, of allowing access to . . . Are those other counties in this lawsuit? The answer to that's no, isn't it? No. Okay. Then, why wouldn't you want to sit down with a mediator and at least resolve this? And then you can tell those other counties, we were able to resolve it in a mediated way. What's wrong with that? Honestly, Your Honor . . . Have you ever sat down with a really good mediator? No. Okay. Because we have some terrific mediators on this court that are . . . They're not retired judges. They're employees of this court. They have significant litigation experience. And my guess is, they could help you resolve this. Think about it. Sorry to interrupt you. No, Your Honor. Frankly, one wonders about what kind of cases should be on appeal. And whether this is a good result. I'll suggest that it is. But if I can get back to it. My only point is . . . The best result in this case, without question . . . I don't think anybody . . . . . . would be an accommodation that allows her client to do his research that doesn't unnecessarily impact the administrative processes of your client. And everybody's happy. And, Your Honor, that's frankly what the court was trying to do. But if I can . . . If I can get back to this point, because it's the one point . . . But hasn't done in three years. I'm sorry, Your Honor? But hasn't been able to accomplish in three years. The lawsuit pending, Your Honor, no. I mean, that's the problem, Your Honor. But if I can get . . . That's a problem? So, the fact that they exercised their right to bring a lawsuit means you stopped negotiating? No, it's the exact opposite. Then why? Hasn't it been solved in three years? Again, it's extra record, Your Honor. And I can only say that there have been, I think, pretty fairly good discussions and several offers. You know, one of the wonderful things about mediation is you don't have to worry about the record. Yeah. You don't have to worry about the law. With respect, Your Honor, I don't want to make it . . . I don't disagree with that. Okay. I don't disagree with that. At any event, to get back to the issue, the court was trying to make a point in the last paragraph that it would not be denying records. Its view was that public records, access, they're entitled to. I think had discussions continued and had there been a decision, I'm not sure that that even would have been where the court landed in terms of the kind of access that was granted. But you never got there. There are so many things that Mr. Robertson didn't answer in the record before the lawsuit was filed that would have affected how the court made its decision. Now, what if he had answered, as Judge Hawkins suggested, I am looking into this because I basically think you're not conducting your court in a racially neutral manner. It's the police officers, Your Honor. The police officers. And I think . . . The rest. Yes, fair enough. Absolutely. I think this will prove it and it will be a . . . if I'm right, I'm going to write an article that will be an embarrassment to all concerned. So, if he had answered to that, you think what would your court have said? Oh, that's fine. I mean, what's their purpose in asking him what his purpose is? If you understand . . . when you look at the laws and how they treat access requests, one of the things that all of these laws recognize is that there's a distinction between asking for a request in a particular case. You know, give me the record of this case, public right of access, First Amendment. Different when you're talking bulk access because now you're asking for all this information about, in this case, 10,000 people a month. And I'd refer the court to the case called Westbrook v. County of Los Angeles where the court has a very good discussion of the distinction between those two. But keeping in mind now that we're talking about these big, big . . . All right. Even a dumb judge like me understands that distinction, but . . . But then there are three things that are different. Number one, there's all this personal identifying information, including signatures. That's a problem, I think. And, frankly, some courts have looked at that and haven't had a problem with it. This court has, number one. Number two . . . He doesn't want that. That's not what the record shows, Your Honor. He's not asked for copies of these documents. Yes, he has, Your Honor. That's exactly what he's asked for. He has asked for the actual traffic tickets. Well, if he did ask for copies, as your client said, we'll give you a redacted one, one that doesn't have Social Security information, the individual's signature, et cetera. That's the problem. We never got that far. That's what you use a mediator for. In some respects, Your Honor, I'm not helping my own case here in some respects, but you're preaching to the choir. But to answer the question on the legal issue, one, there's personally identifying information that Identity Thieves would love. Two, and you look at all the legislative history between all these acts that talk about public access, there's a recognition by the Congress and by the California legislature that folks who seek bulk access tend to sell the information off. And so, three, what the legislatures and the California legislature has done and what the Congress of Chief Justices recommends is that in these cases, if you have the person who's asking for access, work through the privacy issues, which are part . . . And, by the way, one of the issues there is who pays for it. That's just an issue that we're just not even there yet. But then what you say is, give me a declaration that says, one, this is for research purposes, and two, I'm not going to sell the information to third parties because that's where the privacy concerns come in. But none of that happened here because it was . . . I don't understand what that requires of inquiries about him. You would have those same conditions as to any third party who was requesting information, whether they were requesting $10,000 or $10,000. You would still want to protect the privacy. You would still want to protect against selling. So those are perfectly reasonable restrictions that you would put on. It didn't require all this inquiry back to him. It's irrelevant back to him. Those are conditions you would set in any case. I'm not sure you would set them in individual cases. Well, if you're requesting your own record, of course. Sure. But we're talking, as you pointed out to me, we're not talking about that. We're talking about the other kinds of inquiries. And with respect to bulk access, are those legitimate concerns that a court can have? Yes. Do they happen in all cases? Yes. Did the court inquire, what's the survey about? What do you want this for to confirm that that was the case? Yes. But there was no response back. They would have that same, if he said, I just want to, I'm curious. Or he said, I want it so I can forge their signatures. No matter what he said, you would have those same conditions, good, bad, or indifferent. I'm not sure, Your Honor. Give me an example where you wouldn't. An example, I'll tell you. The signatures, I can't imagine how you would turn that over. But I can give you an alternative, which is, if the information you want for your study that you're structuring is to know how many people have been arrested on thus and such a day by thus and such an officer, would it suffice if we gave you a spreadsheet? And the spreadsheet says, you know, ticket number, citation, who gave it, and whatever information there is with respect to the race of the individual who was stopped. That doesn't require revealing anything. It doesn't go into this redaction issue at all. And it's an alternative. My point, though, you see, is the process, that's where they were trying to work that out. They really were. And it just stopped because we got a letter that says the First Amendment requires that I get everything. That was how it was. If you read the record, that's how, that's all there is. And there was no response to the questions that the court had because the court was trying to figure out how best to respond. So to answer the big questions, and I'll leave it at that because I think you understand the case. First, is there any kind of unequivocal denial ever? No. The court is exactly doing the opposite, which is recognizing that under some circumstances, the information should be made public. The question is how, understanding that there are huge privacy, identity theft issues, as we've described in our papers involved. And those, there were questions that were addressed to Mr. Robertson, so the court could evaluate that and come up with a proposal. The response back was the First Amendment entitles me to access, I get everything, game over. And that's why we're here, Your Honors. Thank you very much. Okay. Thank you. We have a little time for rebuttal. We'll hear any additional argument you have. I just want to make clear, first and foremost, my client did not ask for copies of these records ever. And secondly, in the Vehicle Code, Section 4500, the legislature has also made very clear that you cannot give this material away, create a database, sell it, distribute it, do anything with it. So my client is well aware of the fact that that is prohibited by law. And I would also say identity theft is prohibited by law. So he certainly was not going to copy down people's signatures and try and use that. In response to the question of his motives in the litigation, he responded with a declaration under penalty of perjury saying, I only want to review these records for law enforcement reasons and for nothing else. So in addition to his declaration when his motives were questioned and his two-page, single-spaced request to the court spelling out why he wanted to review the records and the purpose of his study, it has been clear. And at no time has Contra Costa Superior Court ever said to him, why don't you come in and review them on the same basis that you did in Riverside? How long has this case been pending? This case has been pending since October of 2012. So almost three years. Yes, Your Honor. And how close are you to getting your client access to these documents? Not closer than you were when he walked in the door of your law office. That's right, Your Honor. Okay. So do you think mediation can help you get to the point where your client wants to be, where you have the information you want, and their concerns are satisfied? You know, again, I mean, if you're going to say yes. Minors want us to go to mediation, but we've tried that. And I would say courthouse news, the parallel case to this, has had exactly. The sense I'm getting from your adversary is early on they asked you for some more information, and instead of responding in some way, you filed a lawsuit. Now, from your standpoint, maybe you thought they were stonewalling and you had to raise the stakes. But from their standpoint, it looked like an overly aggressive, premature kind of step on your part, and it would be natural that that would tick them off. So what Judge Hawkins is suggesting, I believe, is that mediation would have the great advantage of ignoring all that unfortunate past history, having someone who is totally fresh, unvarnished by all those wounded feelings on both sides, try to work out what would be practical, useful, and get you essentially what you're entitled to. And I don't understand why you're hesitating on that. Again, I can only say what my client has said to me. Of course. And that's that in his experience. And he's filed a declaration to this effect. He doesn't think, based on his experience in the California courts, that he is ever going to get access to these records short of a federal court order. And how is it working out so far? It's not. That's why we're here. If you were in this impossible dream to agree to mediation, what would be, in your view, a reasonable time to bring it to a conclusion, successful or unsuccessful? A reasonable time for the study? No, no. In other words, having waited three years already, I could see that you would be not eager to enter into a mediation that would itself last two years, but a mediation that would last two months would be something where's the harm? You know, again, my client is not here. I can only report to the court what he has told me. If the court orders it, then, you know, certainly I'm sure he will go to the mediation, as Your Honor would order. But he's also been told that all of these courts are different courts and if you get records someplace, you may not get them in another place. So, again, absent. We're a little higher up the food chain than those other courts. Okay? I understand. Thank you. We're done? Okay. Thank you. Let's leave it there. The case just argued will be submitted.
judges: Rakoff, Hawkins, Watford